T.C. Memo. 2000-221


UNITED STATES TAX COURT


GERALD E. AND NANCY J. TOBERMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22289-97.                    Filed July 24, 2000.


<u>Daniel W. Schermer</u>, for petitioners.

<u>John C. Schmittdiel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


THORNTON, <u>Judge</u>:  Respondent determined a $1,194,503

deficiency in petitioners' 1993 Federal income tax and a

$238,901 accuracy-related penalty pursuant to section 6662(a).[1]

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
                                        (continued...)

The issues for decision are:  (1) Whether the notice of deficiency is entitled to a presumption of correctness; (2) whether petitioners had ordinary unreported income due to forgiveness of indebtedness as determined by respondent; (3) whether petitioners are entitled to a net operating loss carryover in the amount of $3,992,234; and (4) whether petitioners are liable for an accuracy-related penalty under section 6662.

## FINDINGS OF FACT

The parties have stipulated some of the facts, which are so found.  The stipulation of facts is incorporated herein by this reference.  When they filed their petition, petitioners were married and resided in Key Biscayne, Florida.  References to petitioner are to petitioner husband.

Petitioner's Business Holdings

From 1986 through 1993, petitioner held extensive business interests, including two solely owned S corporations, Bonnevista Terrace, Inc. (Bonnevista), and Castle Towers, Inc. (Castle Towers), which owned and operated mobile home parks in Minnesota and Indiana.  Bonnevista was incorporated on June 30, 1966, and elected status as an S corporation on July 20, 1966.  Castle

------

[1](...continued)
all Rule references are to the Tax Court Rules of Practice and Procedure.

Towers was incorporated on May 22, 1979, and elected status as an S corporation on December 29, 1986.

Petitioner also owned and operated marinas on Lake Minnetonka in Minnesota through a number of wholly owned corporations.[2] To acquire the marinas, petitioner personally guaranteed bank loans used to acquire the marinas and pledged the mobile home parks as collateral. Initially, petitioner was successful in the marina business. During a drought in 1988 or 1989, however, water levels at the marinas fell significantly. Boaters began removing their boats from the marinas, and the cash-flow from petitioner's marina business practically stopped.

During the drought, Bonnevista and Castle Towers were generating positive cash-flows from the mobile home parks. These funds were used to help keep the marinas operating temporarily.[3] Eventually, however, petitioner lost both the marinas and the mobile home parks.[4]

---

[2] These wholly owned corporations include: St. Albans Bay Marina & Yacht Club, Inc.; Tonka Bay Marina & Yacht Club, Inc.; Shorewood Marina & Yacht Club, Inc.; Maxwell Bay Marina, Inc.; and Smith's Bay Marina, Inc.

[3] The record does not reveal the nature and amount of these transactions.

[4] The record is unclear as to exactly when or in what manner petitioner lost these businesses, or exactly when any of the various corporations may have actually gone out of existence.

Loans From Bonnevista and Castle Towers to Petitioner

After filing Form 1120S, U.S. Income Tax Return for an S Corporation, for its 1991 taxable year, Bonnevista filed no subsequent income tax return.[5] The balance sheet attached to the 1991 Form 1120S reflects loans to petitioner of $2,148,481 as of the beginning of the tax year and $2,244,164 as of yearend.

After filing Form 1120S for its 1990 taxable year, Castle Towers filed no subsequent return.[6] The balance sheet attached to its 1990 Form 1120S reflects yearend loans to petitioner of $633,329.

Petitioner's Ownership Interest in Fantastic Foods

In 1993, petitioner was president and majority stockholder of Fantastic Foods, Inc., which holds exclusive rights to Dairy Queen franchises in two counties in Florida. The corporation has several affiliated corporations also known as Fantastic Foods. The 1992 Federal corporate income tax return of one of those affiliated corporations, Fantastic Foods, Inc. (Delaware), indicates that it is wholly owned by petitioners' son, William

---

[5] The 1991 Form 1120S, U.S. Income Tax Return for an S Corporation, does not indicate that it is the final return of Bonnevista Terrace, Inc. (Bonnevista).

[6] The 1990 Form 1120S does not indicate that it is the final return of Castle Towers, Inc. (Castle Towers). On Schedule E, Supplemental Income and Loss, of their 1991 joint Federal income tax return, petitioners reported both passive and nonpassive income from Castle Towers.

Toberman, and that as of the end of 1992, the corporation owed petitioner $457,072.

Bankruptcy Proceeding

In 1990, petitioner filed for relief under chapter 11 of the United States Bankruptcy Code. On May 21, 1991, petitioner's bankruptcy case was dismissed for petitioner's failure to file a disclosure statement and plan of reorganization as directed by the United States Bankruptcy Court.

Judgments Against Petitioner

Before 1993, a number of judgments were entered against petitioner in favor of various creditors.

IRS Collection Information Statement

In 1993, petitioner submitted to the Internal Revenue Service (IRS) Form 433-A, Collection Information Statement for Individuals (CIS), signed and verified by petitioner on March 3, 1993, as true, correct, and complete. On the CIS, petitioner reported that he had a net worth of approximately $389,650.[7] On the CIS, petitioner reported no outstanding loans from either Bonnevista or Castle Towers. On the CIS, petitioner disclosed neither his ownership interests in Fantastic Foods nor any receivables from Fantastic Foods (Delaware). Petitioner reported

---

[7] The Collection Information Statement for Individuals (CIS) indicates that as of Mar. 3, 1993, petitioner had assets comprising $50 cash and real estate worth $850,000 (subject to encumbrances of $460,000), and had $400 of credit card debts.

on the CIS, under the category "Other information relating to your financial condition", that there were no court proceedings or repossessions.

Petitioner's Claimed Net Operating Loss Deduction

For taxable year 1993, petitioners claimed a net operating loss deduction of $3,992,234, comprising net operating loss carryovers from prior years in the following amounts:

| Year | Amount |
|------|--------|
| 1986 | $134,414 |
| 1987 | 424,283 |
| 1988 | 306,907 |
| 1989 | 1,627,007 |
| 1990 | 1,417,445 |
| 1991 | 82,178 |
|      | 3,992,234 |

Respondent's Determinations

Respondent determined that for taxable year 1993 petitioners had unreported ordinary income of $2,781,810 from discharge of the debts owed by petitioner to Bonnevista and Castle Towers.[8] Respondent also disallowed petitioners' claimed net operating loss deduction.

---

[8] The notice of deficiency charges petitioner with unreported cancellation of indebtedness income based on the $2,148,481 loan due from petitioner to Bonnevista at the beginning of 1991, rather than the $2,244,164 due at the end of 1991. On brief, respondent states that although the facts support using the larger, more recent, loan balance to compute petitioner's 1993 cancellation of indebtedness income, respondent has not amended his position to assert an increased deficiency.

OPINION

I.  Whether the Notice of Deficiency Is Entitled to a Presumption
    of Correctness

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer has the burden of proving them incorrect.  See Rule 142(a); United States v. Janis, 428 U.S. 433, 441-442 (1976); Welch v. Helvering, 290 U.S. 111, 115 (1933); Feldman v. Commissioner, 20 F.3d 1128, 1132 (11th Cir. 1994), affg. T.C. Memo. 1993-17.  Petitioners argue that respondent's determination is entitled to no presumption of correctness because it was arbitrary and capricious.

The Court of Appeals for the Eleventh Circuit, to which this case is appealable absent stipulation, has stated that the presumption of correctness adheres once the Commissioner has made a "minimal" evidentiary showing linking the taxpayer to the alleged income-producing activity.  Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636.[9]  The

---

[9] Petitioners' reply brief states that because this case was tried in St. Paul, Minn., and because petitioners have ties to Minnesota, they "assume that a stipulation to appeal the case to the Eighth Circuit will be a routine matter."  See sec. 7482(b)(2).  We need not linger long over petitioners' assumption, however, for we discern no essential difference in the standards applied in the Eleventh and Eighth Circuits in determining whether the statutory notice is supported by an adequate evidentiary foundation to sustain the presumption of correctness.  Cf. Page v. Commissioner, 58 F.3d 1342, 1347 (8th Cir. 1995) (the presumption of correctness fails "where the Commissioner makes the assessment without any foundation or supporting evidence" (Emphasis added.)), affg. T.C. Memo. 1993-
(continued...)

Commissioner may support his determination on the basis of any admissible evidence and need not rely on the evidence used in making the administrative determination.  See <u>Jackson v. Commissioner</u>, 73 T.C. 394, 400 (1979).  This conclusion is a natural consequence of the well-established principle that "a trial before the Tax Court is a proceeding de novo; our determination of a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level."  <u>Id.</u> (citing <u>Greenberg's Express, Inc. v. Commissioner</u>, 62 T.C. 324, 328 (1974)); see also <u>Gatlin v. Commissioner</u>, 754 F.2d 921, 923 (11th Cir. 1985), affg. T.C. Memo. 1982-489.   An exception to this rule against looking behind the notice of deficiency may apply in the rare case where the Commissioner introduces no substantive evidence but simply rests on the presumption of correctness regarding his determination that a taxpayer has unreported income.  See <u>Jackson v. Commissioner</u>, <u>supra</u> at 401.  As discussed below, this is not such a case.

---

[9](...continued)
398; <u>Day v. Commissioner</u>, 975 F.2d 534, 537 (8th Cir. 1992) ("Courts have occasionally declined to accord a presumption of correctness to a deficiency notice when the Commissioner fails to introduce <u>any</u> substantive evidence linking the taxpayer to the income generating activity in question." (Emphasis added.)), affg. in part, revg. in part on other grounds and remanding T.C. Memo. 1991-140.

A.  Discharge of Indebtedness Income

Stipulated evidence--specifically, Bonnevista's 1991 Federal income tax return and Castle Tower's 1990 Federal income tax return--shows that as of December 31, 1991, petitioner owed Bonnevista $2,244,164, and that as of December 31, 1990, he owed Castle Towers $633,329.  Petitioners have stipulated that Bonnevista and Castle Towers filed no subsequent Federal income tax returns.  These corporations failed, however, to provide respondent the notification that would have been required if they had ceased to exist.[10]

The stipulated evidence shows that in March 1993 when he submitted his financial statement to the IRS, petitioner represented under penalties of perjury--and does not now dispute--that he no longer owed these liabilities.  Petitioner does not argue, and has adduced no evidence to show, that he directly repaid these loans.

---

[10] If an S corporation ceases to exist, it thereby terminates its election under sec. 1362(a) to be taxed as an S corporation and is required to attach to its return for the taxable year in which the termination occurs a notification that a termination has occurred and the date of termination.  See sec. 1.1362-2(b)(1), Income Tax Regs.  In addition, if the corporation has ceased to exist, box F(2) of Form 1120S, indicating a final return, must be checked.  See Instructions for Form 1120S; see also sec. 1.6037-1(a)(5), Income Tax Regs. (the return of an S corporation shall include, inter alia, information as is required by the instructions issued with respect to the form).  The last returns presented by Bonnevista and Castle Towers, as stipulated into evidence, include no attachments notifying the Commissioner that a termination has occurred, nor is box F(2), indicating a final return, checked on either return.

In these circumstances, it was not arbitrary for respondent to conclude that Bonnevista and Castle Towers were still in existence in March 1993, and that petitioner's debts to the corporations were discharged when petitioner first represented to respondent that he no longer owed the debts previously reported to be owing to his wholly owned corporations. We conclude that respondent has made the requisite minimal evidentiary showing linking petitioner to the discharge of indebtedness income in question. Accordingly, the presumption of correctness remains intact, and petitioner bears the burden of rebutting the presumption by showing that the inference of gross income from discharge of indebtedness was unreasonable. See Page v. Commissioner, 58 F.3d 1342, 1347-1348 (8th Cir. 1995), affg. T.C. Memo. 1993-398; Blohm v. Commissioner, supra at 1549.

B. Net Operating Loss Deduction

As regards respondent's determination disallowing petitioners' claimed net operating loss deduction for lack of substantiation, the requirement that respondent make a predicate evidentiary showing is inapplicable; petitioners bear the burden of proving their right to, and the amount of, the claimed deduction. See Amey & Monge, Inc. v. Commissioner, 808 F.2d 758, 761 (11th Cir. 1987), affg. T.C. Memo. 1984-642; Gatlin v. Commissioner, supra at 923.

II.  Discharge of Indebtedness Income

Generally, discharge of indebtedness gives rise to gross income to the obligor.  See sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs.  The general rationale for this rule is that discharge of indebtedness enriches the obligor by freeing up assets otherwise needed to repay the debt.  See United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); Milenbach v. Commissioner, 106 T.C. 184, 202 (1996); Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).  A debt is deemed to be discharged as soon as it becomes clear, on the basis of a practical assessment of all the facts and circumstances, that it will never have to be paid.  See Cozzi v. Commissioner, supra at 445.  Any identifiable event that fixes with certainty the amount to be discharged may be taken into consideration.  See id.  The event may or may not be overt; "ultimately, it is the actions of the taxpayer in the context of the circumstances of a case" that determine whether an abandonment or discharge of indebtedness has taken place.  Id. at 446.  The taxpayer bears the burden of proving that there was no valid debt, that a discharge of debt did not occur, and that the year of the discharge determined by the Commissioner is erroneous.  See Rule 142(a); Waterhouse v. Commissioner, T.C. Memo. 1994-467; Carlins v. Commissioner, T.C. Memo. 1988-79.

A.  Was Petitioner a "Net Lender" to Bonnevista and Castle Towers?

Petitioners do not dispute that sometime before 1992, Bonnevista and Castle Towers made loans to petitioner.  Rather, petitioners argue that "there were loans going both ways between Mr. Toberman on the one hand and Bonnevista and Castle Towers on the other hand" and that "if the loans were netted out, Mr. Toberman would have been a net lender."  Therefore, petitioners argue, there was no debt to forgive.

Except for petitioner's vague and uncorroborated testimony, there is no proof that he was a "net lender" to Bonnevista and Castle Towers.  Petitioners have failed to provide any documentary evidence of any indebtedness from Bonnevista or Castle Towers to petitioner.  We are not obligated to accept petitioner's self-serving and uncorroborated testimony in this regard, see Day v. Commissioner, 975 F.2d 534, 538 (8th Cir. 1992), affg. in part, revg. in part and remanding T.C. Memo. 1991-140; Tokarski v. Commissioner, 87 T.C. 74 (1986), and we do not.

B.  Did Petitioner Repay the Loans?

Petitioners do not argue that petitioner ever repaid the loans in question directly.  Rather, they argue that petitioner personally guaranteed third-party loans to Bonnevista and Castle Towers, and that these guaranties ultimately resulted in judgments against him.  Petitioners failed to corroborate the

amount and nature of petitioner's guaranties of his corporations' debts.  Although the record contains notices of judgment against petitioner, the notices generally provide no explanation of the specific circumstances of the judgments or of the underlying debts giving rise to them.  The notices that do provide explanations do not establish that the underlying debts related either to Bonnevista or Castle Towers.  In at least one instance, the evidence clearly indicates that the judgment against petitioner was for his own debts, rather than those of Bonnevista or Castle Towers.[11]  In short, petitioners have failed to show that petitioner repaid, directly or indirectly, Bonnevista's or Castle Towers' loans to him.

C.  When Did the Discharges of Indebtedness Occur?

Petitioners contend that if there was any discharge of indebtedness, it must have occurred in 1992 rather than 1993, because Bonnevista and Castle Towers went out of business in 1992.  The record does not support this contention, which is contradicted in part by petitioners' own petition, which alleges that Bonnevista was involved in litigation with creditors until 1997.  Petitioner testified vaguely that he "lost" Bonnevista and

---

[11] A Federal District Court order, dated Sept. 22, 1992, entering judgment of $832,806 against petitioners and various other parties, not including Bonnevista or Castle Towers, in favor of Holroyd Enterprises, Inc., indicates that the underlying debt on which the judgment was based was a promissory note executed by petitioner and secured by a mortgage on the Shorewood Marina & Yacht Club.

Castle Towers in 1992.  There is no evidence in the record, however, as to the manner in which petitioner "lost" Bonnevista or Castle Towers, or when the corporations might actually have ceased to exist.  Petitioner testified unconvincingly that he did not know what happened to the business records of either Bonnevista or Castle Towers.  We cannot assume that the missing evidence would have been favorable to petitioners; to the contrary, the usual inference is that the evidence would be adverse.  See Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968).

Relying on petitioner's representations in the March 3, 1993, CIS that he no longer owed the debts, respondent determined that the debts were discharged on that date. Petitioner has failed to show that respondent's determination was unreasonable.  Cf. Cozzi v. Commissioner, supra at 447-448 (where it is impossible to identify one, and only one event, that clearly fixes the time of a discharge of indebtedness, the burden is on the taxpayer to prove that the event determined by the Commissioner to fix the time is unreasonable).

D.  Do Petitioners Qualify for the Insolvency Exception?

Petitioners argue that they qualify for the exclusion under section 108(a)(1)(B), which generally provides that gross income does not include amounts from discharge of indebtedness if the

discharge occurs when the taxpayer is insolvent.  To claim the benefit of the insolvency exclusion, the taxpayer:

> must prove (1) with respect to any obligation claimed to be a liability, that, as of the calculation date, it is more probable than not that he will be called upon to pay that obligation in the amount claimed and (2) that the total liabilities so proved exceed the fair market value of his assets.

Merkel v. Commissioner, 109 T.C. 463, 484 (1997), affd. 192 F.3d 844 (9th Cir. 1999).

Petitioner claims that he was insolvent "by at least two to three million dollars" in 1993 when his debts to Bonnevista and Castle Towers were discharged.  In support of this contention, petitioner relies on the vague and conclusory testimony of himself and his accountant.  Petitioner has failed to provide any details, however, as to either the specific liabilities he claims to have owed or the fair market value of his assets in 1993.  His testimony in this regard is contradicted by his admission in the CIS, which he signed on March 3, 1993, representing that he had a positive net worth of approximately $389,650--an amount that appears to have been understated by at least the value of his ownership interests in Fantastic Foods and his $457,072 receivable from Fantastic Food (Delaware), as reported on that entity's 1992 Federal corporate income tax return.  We conclude and hold that petitioners have failed to establish that they qualify for the insolvency exception under section 108(a)(1)(B).

E.  Should Petitioners' Income From Discharge of
Indebtedness Be Treated as Ordinary Income?

Petitioners argue that respondent erred in treating the entire amount of discharge of indebtedness income as ordinary income rather than as capital gain.  Petitioners cite section 316, which generally defines a dividend as a distribution out of a corporation's earnings and profits.  Petitioners argue that Bonnevista and Castle Towers had no earnings and profits, and therefore any distribution to petitioner could not have been a dividend.  Respondent's answering brief, citing section 1368, among other statutory provisions, argues that petitioners had ordinary income from the discharge of indebtedness.[12]

The forgiveness of a shareholder's debt by an S corporation is considered a distribution of property.  See Haber v. Commissioner, 52 T.C. 255, 262 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970); see also sec. 301(c); sec. 1.301-1(m), Income Tax Regs.  The tax treatment of a distribution of property

_____

[12] In the notice of deficiency, respondent treated the income from discharge of indebtedness as ordinary.  In opening statements at trial, both parties addressed the proper characterization under subch. S rules of any income from discharge of indebtedness.  The parties were directed to file seriatim briefs.  In their opening brief, petitioners addressed the characterization issue with only cursory legal analysis.  In his brief in answer, respondent addressed the issue more thoroughly, with citations to the appropriate subch. S rules.  In reply, petitioners argue that respondent's brief improperly asserts new issues relating to subch. S distributions. Petitioners' arguments are without merit.  See Pagel, Inc. v. Commissioner, 91 T.C. 200, 211-212 (1988), affd. 905 F.2d 1190 (8th Cir. 1990).

by an S corporation depends upon whether the corporation has accumulated earnings and profits. Compare subsec. (b) with subsec. (c) of sec. 1368. If the S corporation has no accumulated earnings and profits, the distribution is nontaxable to the extent of the shareholder's adjusted basis in the stock. See sec. 1368(b)(1). Distributions in excess of adjusted basis are treated as gains from the sale or exchange of property. See sec. 1368(b)(2). If the S corporation has accumulated earnings and profits, then distributions, in some circumstances, are treated as dividends and thus as ordinary income. See sec. 1368(c)(1) and (2).

Petitioners argue that Bonnevista and Castle Towers had no accumulated earnings and profits in 1993, because the corporations were not then in existence. Petitioners argue alternatively that earnings and profits did not exceed the retained earnings reported by Bonnevista and Castle Towers on Schedules L, Balance Sheets, of the last Federal income tax returns that they filed (i.e., Bonnevista's 1991 Form 1120S and Castle Tower's 1990 Form 1120S).[13]

Petitioners' arguments are without merit. In the first instance, as previously discussed, petitioners failed to

---

[13] On Schedule L of its 1991 Form 1120S, Bonnevista reported negative yearend retained earnings of $626,228. On Schedule L of its 1990 Form 1120S, Castle Towers reported yearend retained earnings of $218,623.

establish that Bonnevista and Castle Towers were not in existence in 1993.  Moreover, retained earnings as reported on Schedule L of Form 1120S do not necessarily equate to the S corporation's earnings and profits.  See sec. 312; sec. 1.312-6, Income Tax Regs.; IRS Publication 589, Tax Information on S Corporations 14 (1994, for use in preparing 1993 returns) ("If a corporation has accumulated E&P, the retained earnings and accumulated E&P usually will not be the same because of the special rules for figuring retained earnings.").[14]

Under current law, S corporations generally do not generate current earnings and profits.  See sec. 1371(c).  An S corporation can have accumulated earnings and profits, however, that may arise in various ways, including:  (1) As a carryover from years in which it was a C corporation before it became an S corporation, see Cameron v. Commissioner, 105 T.C. 380, 384 (1995), affd. 111 F.3d 593 (8th Cir. 1997); (2) as S corporation earnings for taxable years prior to 1983, see H. Conf. Rept. 104-737, at 227 (1996), 1996-3 C.B. 741, 967;[15] and (3) as the result

---

[14] Even if Bonnevista's and Castle Towers' reported retained earnings did correlate with their accumulated earnings and profits, there is no reason to believe that earnings and profits of Bonnevista and Castle Towers as of the end of 1991 and 1990 respectively would accurately represent their earnings and profits as of 1993, when petitioner's debt was discharged.

[15] H. Conf. Rept. 104-737, at 227 (1996), 1996-3 C.B. 741, 967, describing then-current law, states:

(continued...)

of certain reorganizations and the like.  See sec. 1371(c)(2);
see also Eustice & Kuntz, Federal Income Taxation of S
Corporations, sec. 8.08[8][b], at 8-62 (3d ed. 1993).[16]

Bonnevista and Castle Towers each elected S corporation
status sometime after their incorporation.  We infer that each
corporation was a C corporation before electing S status.
Moreover, Bonnevista was an S corporation for taxable years prior
to 1983.  Petitioners have failed to show that Bonnevista and
Castle Towers did not have accumulated earnings and profits
arising from their C corporation operations before electing S
status, that Bonnevista had no accumulated earnings and profits
from S corporation operations for taxable years prior to 1983, or

---

[15](...continued)
under the subchapter S rules in effect before revision
in 1982, a corporation electing subchapter S for a
taxable year increased its accumulated earnings and
profits if its earnings and profits for the year
exceeded both its taxable income for the year and its
distributions out of that year's earnings and profits.
As a result of this rule, a shareholder may later be
required to include in his or her income the
accumulated earnings and profits when it is distributed
by the corporation.  The 1982 revision to subchapter S
repealed this rule for earnings attributable to taxable
years beginning after 1982 but did not do so for
previously accumulated S corporation earnings and
profits.

[16] In 1996, Congress eliminated certain pre-1983 accumulated
earnings and profits for certain S corporations that existed
before 1983, effective for the first taxable year beginning after
Dec. 31, 1996.  See Small Business Job Protection Act of 1996,
Pub. L. 104-188, sec. 1311, 100 Stat. 1755, 1784.  Accordingly,
this legislative provision is inapplicable to the instant case.

that Bonnevista and Castle Towers had no accumulated earnings and profits as the result of reorganizations and the like. Accordingly, section 1368(c) is the applicable provision for determining the tax treatment of the distributions to petitioner arising from the discharge of his indebtedness to Bonnevista and Castle Towers.

Under section 1368(c), distributions are deemed to come first from the S corporation's so-called accumulated adjustments account (AAA), which is intended to measure the corporation's accumulated taxable income that has not been distributed to shareholders. See sec. 1368(e); Williams v. Commissioner, 110 T.C. 27, 30 (1998). The AAA is increased by the S corporation's income and is decreased by its losses and nontaxable distributions to shareholders. See secs. 1367 and 1368. The AAA is reduced first by current-year losses and deductions before considering shareholder distributions for the year. See Williams v. Commissioner, supra at 34. Distributions that do not exceed the AAA, like distributions from S corporations with no earnings and profits, are treated as tax free to the extent of the shareholder's adjusted stock basis and then as capital gains. See sec. 1368(c)(1); sec. 1.1368-1(c), Income Tax Regs. Amounts distributed in excess of the AAA are next treated as dividends, and thus as ordinary income, to the extent of the S corporation's accumulated earnings and profits. See sec. 1368(c)(2).

Petitioners have failed to establish that any AAA existed for either Bonnevista or Castle Towers at the time of the discharge of petitioner's indebtedness in 1993.[17]  In the absence of such evidence, it is not unreasonable to assume that in 1993 there was no AAA for either of these financially troubled corporations, especially since prior losses have the effect of reducing the AAA.  See secs. 1367 and 1368.

Furthermore, as previously discussed, petitioners have failed to show that Bonnevista and Castle Towers had accumulated earnings and profits in 1993 less than the amount determined by respondent to represent ordinary income from the discharge of petitioner's indebtedness by each of these corporations. Accordingly, we sustain respondent's determination that the discharge of petitioner's indebtedness to Bonnevista and Castle Towers gave rise to ordinary income.

III.  Net Operating Loss Deduction Carryover

On their 1993 Federal income tax return, petitioners claimed a net operating loss deduction of $3,992,234, comprising net operating loss carryovers for each of the years 1986 through 1991.  In the case of net operating loss deductions, as with other deductions, petitioners bear the burden of proving their entitlement to the claimed deductions.  See Rule 142(a); Jones v.

---

[17] On its 1991 Form 1120S, Bonnevista reported no AAA.  On its 1990 Form 1120S, Castle Towers reported AAA of $248,028 as of Dec. 31, 1990.

Commissioner, 25 T.C. 1100, 1104 (1956), revd. and remanded on other grounds 259 F.2d 300 (5th Cir. 1958); Leitgen v. Commissioner, T.C. Memo. 1981-525, affd. per curiam without published opinion 691 F.2d 504 (8th Cir. 1982).

Petitioners failed to produce any books or records supporting the claimed losses. Instead, petitioners presented their individual Federal income tax returns for the years 1986 through 1992, which show losses arising principally from rental properties and S corporations that petitioner owned, and some-- but not most--of the relevant S corporation returns. Petitioners also rely upon their accountant's testimony regarding his return preparation procedures.

The testimony of petitioners' accountant is insufficient to establish either the fact or amount of any net operating loss. See Williams v. Commissioner, T.C. Memo. 1990-266. The tax returns are merely a statement of petitioners' position and do not constitute proof of the claimed losses.[18] See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957).

---

[18] Petitioners' Federal income tax return for 1987 specifically notes that the return is tentative and will be amended. There is no evidence that any amended return was ever filed.

Petitioners have failed to sustain their burden of proof as to the claimed net operating loss deduction.

IV.   Section 6662 Penalty

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662.  Section 6662(a) imposes a 20-percent penalty on any portion of an underpayment that is attributable to negligence.  Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the same circumstances.  See Neely v. Commissioner, 85 T.C. 934 (1985).  A taxpayer's failure to keep adequate books and records may constitute negligence.  See Crocker v. Commissioner, 92 T.C. 899, 917 (1989); sec. 1.6662-3(b), Income Tax. Regs.

No penalty shall be imposed under section 6662(a) with respect to any portion of an underpayment if it is shown that there was reasonable cause and that the taxpayer acted in good faith.  See sec. 6664(c).  Whether a taxpayer acted with good faith depends upon the facts and circumstances of each case.  See sec. 1.6664-4(b)(1), Income Tax Regs.  The burden of proof is upon the taxpayer.  See Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Petitioners argue that the negligence penalty should not apply because they relied upon the services of their accountant. Reliance on the advice of an accountant or other professional tax

adviser does not necessarily demonstrate reasonable cause unless the reliance was reasonable and the taxpayer acted in good faith, which requires, among other things, that the advice be based on all pertinent facts and circumstances and on no unreasonable factual or legal assumptions.  See sec. 1.6664-4(b)(1) and (c), Income Tax Regs.  If the taxpayer fails to provide the accountant with the information necessary for preparing the return, the taxpayer is liable for the penalty.  See Johnson v. Commissioner, 74 T.C. 89, 97 (1980), affd. 673 F.2d 262 (9th Cir. 1982).

Petitioners failed to prove that they provided their accountant complete information for preparing their 1993 joint Federal income tax return.  In addition, petitioners failed to show that they kept adequate books and records to substantiate their claimed net operating loss deduction.  With regard to both the discharge of indebtedness income and the claimed net operating loss deduction, petitioners failed to show that they had reasonable cause or acted in good faith.

Accordingly, respondent's determination of an accuracy-related penalty under section 6662(a) is sustained.

Decision will be entered

for respondent.
